**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

**RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHEILA C. BYNUM-COLEMAN,<br><br>a/k/a SHEILA C. COLEMAN,<br><br>*Defendant*. | Case No. 3:25CR44 |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING &
MOTION FOR UPWARD VARIANCE**

The United States of America, through its undersigned attorneys, hereby submits its position with respect to sentencing for defendant Sheila C. Bynum-Coleman.  The United States has reviewed the Presentence Investigation Report (PSR), Dk. No. 98, and does not dispute any of the facts or factors set out therein.

The defendant's applicable Sentencing Guideline range, based on her Total Offense Level of 16 and her Criminal History Category of I, is 21 to 27 months of imprisonment.  PSR ¶¶ 122-123.  After careful consideration of each of the statutory factors enumerated in 18 U.S.C. § 3553(a), the United States recommends that the Court vary upward—to a sentence of 41 months—to properly account for the scope and persistence of the defendant's misconduct; to acknowledge the reality that the defendant chose to design and execute her scheme to defraud the United States Government and the Virginia Employment Commission while she was on a period of court-imposed good behavior; and to effectively deter the defendant and other criminally like-minded individuals from committing further crimes. Such a sentence is sufficient, but not greater than necessary, to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

1

**BACKGROUND**

In April 2020, the United States was reeling through the initial onslaught of the COVID-19 pandemic.  Within a matter of weeks—between late February to early April—the pandemic went from an evening news curiosity to a public health catastrophe.  On February 29, 2020, the (seven-day) daily average of reported COVID-19 cases in the United States stood at six; the daily average for COVID-19 hospitalizations at six patients; and the daily average death toll for COVID-19 at one.[1]  Less than two months later, the virus had engulfed the country, racing from coast to coast and killing and sickening tens of thousands of Americans every day:  On April 20, 2020, the daily average of new reported COVID-19 cases in the United States had skyrocketed to 29,167; the number of Americans hospitalized stood at an average of 54,352; and 2,235 Americans were dying—every day—from the disease.[2]

The nation's economy—with its workers and consumers sickened, quarantined, and ordered to stay home—staggered.  Tens of millions of Americans lost their jobs during the pandemic's darkest early months: in April 2020, "employment plummeted, dropping by 20.7 million—the largest decline in the history" of the Bureau of Labor Statistics' 80-year-old employment statistics survey.[3]  Eager to steady the nation's wobbling economy, Congress appropriated billions of dollars to create or supplement government relief programs, to include the Payroll Protection Program (PPP) and the Economic Injury Disaster Loan (EIDL) programs.  In the interest of alleviating the urgent needs of unemployed workers, independent contractors, small

---

[1]    Johns Hopkins University of Medicine Coronavirus Resource Center, "*Timeline Comparisons*," https://coronavirus.jhu.edu/region/united-states (last visited Jun 10, 2026).

[2]    *Id*.

[3]    U.S. Bureau of Labor Statistics, Monthly Labor Review, June 2021: "*COVID-19 ends longest employment recovery in CES history, causing unprecedented job losses in 2020*," https://www.bls.gov/opub/mlr/2021/article/covid-19-ends-longest-employment-expansion-in-ces-history.htm (last visited June 10, 2026).

businesses, and non-profits, the United States made a policy decision to deliver this relief as quickly as possible, even if that speed came at the expense of scrutiny.

Most Americans, meanwhile, surveyed this landscape of human suffering and economic wreckage with dismay. The defendant saw a crisis ripe for exploitation.

Beginning in May of 2020, the defendant fraudulently sought and obtained more than $225,000 in loan proceeds from the Paycheck Protection Program. The defendant then used those government relief funds—intended to assist genuinely struggling American workers and small businesses—on her own personal purposes, including paying off the mortgage on her personal residence, purchasing luxury clothing, and paying off her personal credit cards. The defendant also—while representing to the Small Business Association and financial institutions that she was busily *employed* at some eight different businesses—simultaneously set about defrauding the Virginia Employment Commission, submitting fraudulent applications for *unemployment* benefits. The defendant was successful in this fraudulent endeavor, as well, successfully obtaining more than $17,000 of unemployment compensation benefits that were intended to support Virginia residents who were actually enduring the financial hardships and emotional uncertainty attendant to their pandemic-related unemployment.

On July 22, 2025, the United States charged the defendant for this conduct by way of a 13-count Superseding Indictment returned by a grand jury in the Eastern District of Virginia, Richmond Division. PSR ¶ 1. Counts One through Ten charged the defendant with False Statements on Loan Applications, in violation of 18 U.S.C. §§ 1343 and 2; Count Eleven, with Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of 18 U.S.C. §§ 1957 and 2; and Count Twelve, with Failure to File Form 2020 Form 1040, in violation of 26 U.S.C. § 7203. PSR ¶¶ 1-13. On February 5, 2026, the defendant appeared

before this Court, and plead guilty to Counts Two and Twelve of the Indictment pursuant to a written plea agreement with the United States.  PSR ¶ 16.  Sentencing is set for June 25, 2026.

## POSITION ON SENTENCING

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing guidelines are "effectively advisory." *Id.* at 245.  Nonetheless, the advisory nature of the Guidelines "does not mean that they are irrelevant to the imposition of a sentence." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006); *see also United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006).  Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities."  *Booker*, 543 U.S. at 264 (internal quotation omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the range prescribed by the sentencing guidelines after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.*

### A.  The Advisory Guidelines Range

As noted above, the United States has no objection or corrections to the PSR.  By separate filing, the United States will move the Court to award a one-level decrease in the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b).  With this reduction, the defendant's Total Offense Level is 16 and her Criminal History Category is a I.  This yields a Guidelines range of 21 to 27

months.  PSR ¶¶ 122-123.

### B.  18 U.S.C. § 3553(a) Factors

After the Court has properly calculated the Guidelines range and ruled upon all departure motions, the Court must then consider the factors identified in 18 U.S.C. § 3553(a) to fashion a reasonable sentence.  *Gall v. United States*, 552 U.S. 38 (2007).  Here, the § 3553(a) factors discussed below support an upward variance from the defendant's advisory guidelines range.

### 1.  Nature and Circumstances of the Offense

The PSR and the defendant's Statement of Facts (Dk. No. 88) amply detail the facts of the defendant's scheme to defraud the United States:  over the course of more than nine months spanning May of 2020 through March of 2021, the defendant occupied herself with creating fraudulent applications for PPP loans—replete with false statements about the various businesses' annual income, sales, gross receipts, and profit figures, as well as false certifications about the amount of time that the business had been in existence; and accompanied by fabricated IRS Form 1040 Schedule Cs that purported to corroborate the defendant's false statements. The defendant ultimately obtained more than $225,000 of pandemic assistance loan proceeds, which the defendant directed to and/or through at least nine different bank accounts, including accounts maintained (at least ostensibly) for the benefit of her political campaign for a seat in the Virginia House of Delegates ("Friends of Sheila for Delegate") and the benefit of her minor child.  The defendant then routinely dissipated those fraudulently obtained proceeds on personal expenditures—to include paying down her mortgage, buying luxury clothing, and paying down her personal credit card bills.

The defendant also busied herself on a separate fraud scheme of a completely inverse nature: submitting fraudulent applications for pandemic *unemployment* assistance benefits to the

5

Virginia Employment Commission.  For this scheme, the defendant cast aside the business magnate persona of her PPP fraud scheme, and portrayed herself to the VEC as an unemployed victim of the pandemic's economic devastation: she was unemployed; her place of employment had shuttered because of the pandemic; and she had certainly *not* applied for or received Paycheck Protection Program funds.  But of course the defendant was not unemployed, and she was instead—as noted above—simultaneously and industriously engaged in defrauding the Paycheck Protection Program.

Rather than attempt to re-summarize or condense these facts in their entirety, the United States respectfully submits that consideration of several aggravating factors—none of which are accounted for in the defendant's (albeit properly computed) guideline calculations—militates in favor of an upward variance.

*First*, the defendant's guidelines do not acknowledge the frequency, fluency, and range of the defendant's deceptions.

The defendant created and/or utilized a blizzard of fraudulent paperwork, false statements, sham business entities, and an assortment of bank accounts to initiate and perpetuate her (primary) fraud scheme.  She created (or reinstated) shell companies in the Commonwealth of Virginia for the sole purpose of defrauding the United States Government, submitting loan applications that claimed that those (often just months-old) corporate entities were established and financially successful concerns; she then rapidly cancelled those shell companies once they had served their (fraudulent) purpose of soaking up federal pandemic assistance loan proceeds.  Next, she submitted PPP application after PPP application after PPP application—each application painting a false financial picture of those various business entities; each application accompanied by the defendant's false certification about the business's history.  Third, she created fabricated IRS tax

6

forms—Schedule C forms for these business entities that purported to corroborate her applications' false statements—and attached these fictitious tax forms to her applications, creating the deliberate false impression that the defendant had filed these tax forms with the IRS.  Fourth, the defendant employed a mosaic of bank accounts—some in the names of various business entities, some personal accounts, one belonging to her political action campaign—to receive and cycle the proceeds of her PPP fraud scheme through.

The defendant's guidelines are driven by the amount of funds she illegally obtained, but the true scope of her criminal culpability—her sheer commitment to her fraud scheme, and her willingness to expend significant energy, time, and effort to perpetuate it—is greater than that of a defendant whose fraudulent actions were more limited but nonetheless (for reasons of skill, caprice, or circumstance) produced the same amount of financial loss and resulting guidelines.

*Second*, the defendant's guidelines—again, because they (appropriately) hinge on § 2B1.1's loss-driven focus—do not reflect that the defendant's criminal endeavors included *three* separate fraud schemes the defendant pursued in the course of 2020 and 2021.  The defendant (as noted *supra*) also successfully targeted the Virginia Employment Commission from March through May 2020 with unemployment assistance applications that required the defendant to create and utilize an entirely different set of misrepresentations—and the defendant further sought and obtained loans from an entirely different federal pandemic assistance program (the EIDL program) through the submission of false and misleading statements to the Small Business Administration in her applications for those loans.  Dk. No. 87 (Statement of Facts) at ¶ 35 (PSR at 16).

The defendant's guidelines would be the same if her criminal conduct had been confined to her PPP fraud scheme—and an upward variance is thus appropriate and warranted to reflect the scope and variety of the defendant's predations on government relief and assistance programs.

7

*Third*, the defendant's chosen use of the criminal proceeds is an aggravating and unaccounted for factor in her sentencing guidelines. The defendant utilized funds stolen from government programs designed and intended to provide financial support to struggling businesses and unemployed workers on transparently self-serving purposes: she paid down her home's mortgage, she purchased luxury clothing, and she paid down her personal credit card bills. The defendant's motivating purpose—across her various schemes to defraud—was simple, unmitigated greed.

An upward variance properly acknowledges and accounts for the nature and circumstances of the defendant's offense conduct.

### 2. History and Characteristics of the Defendant

The defendant was born and raised in Virginia, where she grew up with both parents in a middle-income and supportive environment. PSR ¶¶ 71, 76-78. While the defendant reports no physical or psychological abuse from her immediate family (PSR ¶ 81), she does report that she was abused by the teenage son of one of her mother's friends, and later by a boyfriend in her late teens. PSR ¶ 79. The defendant also reports being the victim of a sexual assault at age 20, and attending therapy and taking medication to address the effects of this assault. PSR ¶ 80. The defendant is married; she has two adult stepchildren (her husband's children), and three adult biological children with three other men. PSR ¶¶ 84-90.

The defendant reports her overall health as "excellent." PSR ¶¶ 93-97. The defendant denies any history of suicide attempts, and reports that she does not have suicidal thoughts. PSR ¶ 98. The defendant has been determined to meet the criteria for mild Bipolar Disorder, Post Traumatic Stress Disorder, and Attention Deficit Hyperactivity Disorder. PSR ¶¶ 101-102. The defendant rarely uses alcohol, but has been a daily user of marijuana since her teenage years. PSR

¶¶ 105-106.  The United States notes that despite being forbidden to use controlled substances by her pre-trial *Order Setting Conditions of Release* (Dk. No. 10, at 2), and later, being explicitly instructed by the Court in a May 14, 2025 *Order* that she was forbidden to use or possess marijuana (Dk. No. 32, at 3), the defendant repeatedly tested positive for marijuana usage in the following weeks and months.  PSR ¶ 106.

The defendant has a bachelor's degree in political science from Virginia Commonwealth University, and graduated from Monacan High School in 1990.  PSR ¶¶ 108-109.  The defendant reports having "specialized training and skills in construction and real estate" and she possesses a real estate license.  PSR ¶ 110.  The defendant has been employed as an associate broker with her mother's real estate company since 2003. PSR ¶ 111.  The defendant has also been employed with J.C. Bynum Construction since 2008.  PSR ¶ 112.

The defendant has a criminal history score of zero, and is a Criminal History Category I. PSR ¶ 60.  The defendant qualifies for the Zero-Point Offender reduction (pursuant to U.S.S.G. § 4C1.1), and has received the benefit of that 2-point reduction in her guidelines.  PSR ¶ 56.

### 3.  Need to Afford Adequate Deterrence, Reflect the Seriousness of the Offense, and Provide Just Punishment

The Court must also weigh the need for the sentence imposed to afford adequate specific and general deterrence.  18 U.S.C. § 3553(a)(2).  In this respect, the Government submits that an upward variance is also justified.

The defendant's conduct demonstrates a need for specific deterrence—an assertion the United States would not typically advance when confronted with a defendant with zero criminal history points.  The nature and timing of the defendant's misconduct in this case, however, cannot engender any confidence that the defendant's offense conduct was a momentary hiccup of criminality, never to be repeated.

Over the course of the defendant's various fraud schemes—spanning at least nine months—the defendant lied repeatedly, deliberately, and fluently in order to defraud three separate government programs of funds intended for the support and relief of financially struggling businesses and individuals. The defendant's criminal conduct cannot be dismissed as an aberration, or the unfortunate product of a single bad decision or moment of moral weakness: the defendant lived a life dedicated to fraud for the better part of a year. Equally concerning to the United States is that during this same time frame—as the defendant submitted fraudulent business loan applications and dissipated those loan proceeds on personal spending—the defendant was under a court-ordered period of good behavior following a deferred finding of guilt in the Henrico County Circuit Court. PSR ¶ 68. Finally, the United States notes that the defendant's characterization of her months-long course of fraudulent conduct to the Probation Officer as the product of her lack of "proper professional guidance and understanding" does not square with the reality of her criminal actions. PSR ¶ 34.

The defendant's actions were calculated and repetitive, and she chose to commit them while under the supposedly restraining influence of a deferred judgment in a criminal case. The defendant's actions demonstrate a serious need for specific deterrence.

A sentence within the advisory Guidelines range is likewise appropriate to establish the goal of general deterrence. General deterrence is perhaps even more important in financial fraud cases such as this one, which are often difficult to detect, investigate, and prosecute. *See e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are 'prime candidates for general deterrence.'"). Indeed, the defendant's criminal conduct in this case comprised three distinct schemes and artifices to defraud. A substantial

10

penalty in this case will provide the appropriate disincentives to those contemplating similar criminal conduct. *See e.g.*, *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized."); *United States v. Bergman*, 416 F. Supp. 496, 499 (S.D.N.Y. 1976) (stating that absent a meaningful term of imprisonment, general deterrence—"the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real and that the grim consequence of imprisonment is likely to follow"—will not be achieved.).

An upward variance will send a necessary message to those individuals who may be inclined, as was the defendant, to view governmental financial assistance programs simply as tempting targets of opportunity for their financial predation. Such a sentence reflects the seriousness of the defendant's offense conduct, and will appropriately punish the defendant.

## CONCLUSION

For the reasons discussed above, the United States respectfully requests that the Court vary upwards and sentence the defendant to a term of 41 months of imprisonment.

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

By:          /s/
Thomas A. Garnett
Virginia Bar No. 86054
Avishek Panth
Virginia Bar No. 92450
Assistant United States Attorneys
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400

11

Fax:  (804) 819-7417