**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Richmond Division**

**UNITED STATES OF AMERICA**

**v.**                                                   **Criminal No. 3:25CR44-01-MHL**

**SHEILA C. BYNUM-COLEMAN,**

            **Defendant.**

**SHEILA C. BYNUM-COLEMAN'S MEMORANDUM IN SUPPORT OF SENTENCING,
RESPONSE IN OPPOSITION TO THE UNITED STATES' MOTION FOR UPWARD
VARIANCE, AND MOTION FOR DOWNWARD VARIANCE TO A SENTENCE WITH
<u>NO ACTIVE INCARCERATION</u>**

**INTRODUCTION**

Sheila Bynum-Coleman comes before this Court humbled by the gravity of her conduct, clear-eyed about the harm she caused, and prepared to accept a sentence that holds her accountable without extinguishing her ability to repair what can still be repaired.

This memorandum begins where it must: Sheila pleaded guilty because she accepts responsibility for the offenses of conviction. She does not ask the Court to excuse it, minimize it, or pretend that pandemic relief fraud was harmless. She understands that remorse cannot undo harm, restore public trust, or repay money. But remorse can become something more than regret when it is harnessed to discipline and self-motivation. It can become restitution. It can become meaningful service to the community. It can become a daily obligation to work, report, treat, comply, improve. That is the kind of accountability Ms. Bynum-Coleman asks the Court to impose.

1

The United States asks for forty-one months - a sentence fourteen months above the high end of the advisory range of 21 to 27 months and far beyond what this record requires. Its request is unnecessary, unsupported by the individualized record, and inconsistent with the way courts have actually sentenced comparable pandemic-benefits cases. It turns the same facts already captured by the Guidelines - loss, sophisticated means, and disaster-relief program conduct - into a second punishment, then adds inflammatory labels where 18 U.S.C. § 3553(a) requires careful judgment. The Court should deny the Motion for Upward Variance.

The defense respectfully asks the Court to impose a sentence with no active incarceration. Because Count Two is a Class B felony, Ms. Bynum-Coleman does not ask the Court to impose ordinary probation on that count. See 18 U.S.C. § 3561(a)(1). The legally precise request is this: on Count Two, impose no term of imprisonment, impose restitution, the mandatory special assessment, and no fine or only a nominal fine that does not impair restitution; on Count Twelve, impose a probationary sentence with stringent conditions, including treatment, tax compliance, financial disclosure, community service, employment and business reporting, financial controls, and restitution-related obligations. If the Court concludes that a custodial component is necessary or that supervised release provides the cleaner legal structure, the defense requests a sentence of one day of imprisonment on Count Two, and if necessary one day concurrent on Count Twelve, followed by supervised release with the same strict financial, tax, treatment, restitution, employment, and community-service conditions.

That sentence would punish. It would deter. It would protect the public. It would promote respect for the law. It would preserve restitution. It would protect elderly, disabled, and dependent family members who rely on Ms. Bynum-Coleman for daily practical help. And it would place the exact risk revealed by this offense - financial misconduct - under the exact

2

controls most likely to prevent recurrence: no new credit without approval, no unmanaged business accounts, full financial disclosure, outside bookkeeping and accounting, tax filing, treatment, community service, and the real threat of revocation.

The Government's 41-month proposal would accomplish none of those goals better. It would warehouse at public expense a 54-year-old, zero-point, first felony offender whose risk is financial, not violent. It would remove the person who is materially assisting elderly and disabled relatives. It would destroy income-generating work that can pay restitution. It would stall affordable-housing, re-entry, homelessness, youth, and civic projects described by a broad cross-section of witnesses. And it would do all of that even though this Court can impose a sentence that is immediate, visible, demanding, enforceable, and tailored to the actual risk. Section 3553(a) requires the least severe sentence adequate to achieve the statutory purposes. Here, that sentence is a downward variance to no active incarceration, or at most one day followed by rigorously supervised release.

## I.    PROCEDURAL POSTURE AND GUIDELINE CALCULATIONS

Ms. Bynum-Coleman pleaded guilty to Count Two, False Statements on Loan Application, in violation of 18 U.S.C. §§ 1014 and 2, and Count Twelve, Failure to File 2020 Form 1040, in violation of 26 U.S.C. § 7203. The Plea Agreement provides that the United States will move to dismiss the remaining counts at sentencing. Plea Agreement, ECF No. 87, ¶ 15. The Statement of Facts was adopted for purposes of the plea and Guidelines. Statement of Facts, ECF No. 88.

The PSR calculates a Total Offense Level of 16, Criminal History Category I, and an advisory range of 21 to 27 months. PSR ¶¶ 57, 60, 122-123. The range includes a base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), a 10-level loss increase for loss greater than $150,000

but less than $250,000, a two-level sophisticated-means increase, a two-level emergency-benefits increase, a three-level reduction for acceptance of responsibility, and the two-level zero-point offender reduction under U.S.S.G. § 4C1.1. PSR ¶¶ 35-57.

The PSR also records multiple mitigating facts that strongly support a downward variance: no adult criminal convictions; zero criminal-history points; no pending charges; no other criminal conduct identified by Probation; no aggravating role; no obstruction; full acceptance of responsibility; pretrial supervision without a requested revocation; approximately $122,000 repaid before sentencing; family caregiving responsibilities; documented community housing and service work; employment skills in real estate and construction; and mental-health treatment needs that can be addressed in the community. PSR ¶¶ 23, 29, 31-34, 56, 58-62, 72, 89-92, 98-103, 110-124.

The PSR identifies $242,955 in guideline loss for Count Two and $4,960 in tax loss for Count Twelve. PSR ¶¶ 26-27. It further reflects that $225,393 in PPP funds were paid into Ms. Bynum-Coleman's accounts, that $122,000 was repaid, and that the remaining PPP restitution balance is $103,393. PSR ¶ 29. Restitution is not symbolic. It is the most concrete way this sentence can repair harm, and incarceration will not create the income needed to pay it.

The defense's variance request does not depend on defeating the PSR. It rests on the statutory record: Ms. Bynum-Coleman accepted responsibility, repaid a substantial amount before sentencing, is a true zero-point first offender, presents a financial-compliance risk rather than a danger to physical safety, and can be punished more precisely through financial controls, treatment, tax compliance, restitution, employment obligations, community service, and revocation risk than through active imprisonment.

II.      RELEVANT LEGAL STANDARD

4

Federal sentencing begins with the Guidelines, but it does not end there. *United States v. Booker*, 543 U.S. 220 (2005), made the Guidelines advisory. *Gall v. United States*, 552 U.S. 38, 49-50 (2007), requires the sentencing court to calculate the range, consider the parties' arguments, apply the § 3553(a) factors, and impose an individualized sentence. *Nelson v. United States*, 555 U.S. 350, 352 (2009), confirms that the sentencing court may not presume the Guidelines sentence is reasonable. *Pepper v. United States*, 562 U.S. 476, 487-91 (2011), permits the Court to consider the fullest information possible concerning the defendant's life and characteristics

Section 3553(a) requires the Court to consider, among other things, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect seriousness, promote respect for law, provide just punishment, deter criminal conduct, protect the public, and provide needed treatment in the most effective manner; the kinds of sentences available; the advisory Guidelines and policy statements; the need to avoid unwarranted disparities; and the need to provide restitution. 18 U.S.C. § 3553(a)(1)-(7). Those factors are not a checklist for ratifying the highest available punishment. They are the statutory architecture for choosing the least severe sentence that works.

That individualized review is especially important in economic-fraud cases because the loss table can dominate the advisory calculation. Loss matters. But loss is not the whole measure of culpability, risk, rehabilitation, or restitution capacity. Courts have recognized that in loss-driven white-collar cases, Guidelines calculations may produce sentences greater than necessary if applied mechanically. See, e.g., *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), aff'd, 301 F. App'x 93 (2d Cir. 2008). In such instances, the court "is forced to place greater reliance on the more general considerations set forth in 3553(a), as carefully applied to

the particular circumstances of the case and of the human being who will bear the consequences. *Id.* A sentencing court may conclude that a guideline sentence is greater than necessary when the full record - including criminal history, repayment, treatment needs, family responsibilities, employment capacity, and the available conditions of supervision - shows that a different sentence better serves § 3553(a).

The 2025 Guidelines reinforce the same point. The United States Sentencing Commission simplified the former sentencing sequence into a two-step process: calculate the guideline range, then determine the appropriate sentence under § 3553(a). U.S.S.G. Ch. 1, Pt. A, intro. comment. (2025). Congress's directive to the Sentencing Commission confirms that first-offender status in a nonviolent case is a meaningful sentencing policy consideration. See 28 U.S.C. § 994(j). Ms. Bynum-Coleman falls within the heartland of that concern: Probation found that she has no adult criminal convictions, zero criminal-history points, and qualifies for the §4C1.1 zero-point-offender reduction. Although her advisory range falls in Zone D and the Guidelines therefore do not themselves authorize a probationary sentence, § 3553(a) requires the Court to impose a sentence sufficient, but not greater than necessary. Her zero criminal history, nonviolent conduct, acceptance of responsibility, repayment of approximately $122,000 before learning she was under investigation, and ongoing restitution obligations support a downward variance from the 21–27 month advisory range. These considerations support a variance to a sentence with no additional term of imprisonment, or, alternatively, the lowest custodial term the Court deems legally available and sufficient under § 3553(a). The available legal structure matters here. Count Two is a Class B felony. Because Ms. Bynum-Coleman is an individual, ordinary probation on Count Two is prohibited. 18 U.S.C. § 3561(a)(1). But imprisonment is not mandatory. Section 3551 authorizes an individual sentence of probation as authorized, a fine as authorized, or

imprisonment as authorized, with restitution and other sanctions imposed as applicable. 18 U.S.C. § 3551(b). If the Court imposes a term of imprisonment - even a one-day term - it may impose supervised release after imprisonment. 18 U.S.C. § 3583(a). Supervised release can carry rigorous conditions tailored to financial-risk prevention, including financial disclosure, financial controls, tax compliance, treatment, employment requirements, community service, and prohibitions on unsupervised fiduciary authority.

The defense therefore presents a legally careful request. It does not ask the Court to disregard the Class B felony probation bar. It asks the Court to deny the upward variance and choose one of two lawful structures: a non-imprisonment monetary sentence on Count Two, paired with probationary conditions on Count Twelve, or, alternatively, one day of imprisonment followed by supervised release on Count Two with stringent conditions. This Court need not find a formal departure to impose the requested sentence. It need only conclude, after considering all seven statutory factors, that on this record the proposed sentence structure is sufficient but not greater than necessary.

## III. THE OFFENSE IS SERIOUS, BUT THE SENTENCE SHOULD FIT THE ACTUAL RISK

Ms. Bynum-Coleman accepts that public-relief fraud is serious. The funds existed to help people and businesses during a national emergency. False claims to those programs harm public trust and divert funds from legitimate need. No sentencing memorandum should pretend otherwise. The Statement of Facts says the conduct was knowing and deliberate. Ms. Bynum-Coleman accepted that statement and preserved acceptance by doing so.

At the same time, the offense should be sentenced with precision. This was not a case involving stolen identities, fictitious strangers, a nationwide ring, weapons, threats, physical

injury, obstruction, or an aggravating role. The risk identified by the offense is a financial-compliance risk. The sentence should match that risk. Financial disclosure, business restrictions, no new credit or loans without approval, tax compliance, restitution monitoring, and community service are not softer than prison because they are more tailored. They are more tailored because they make the punishment fit the problem.

The campaign-related fact may properly concern the Court, but it should not transform this case into something it is not. This is not a bribery case, an honest-services case, or a public-corruption case. There is no allegation of an official act, quid pro quo, sale of public office, or corruption of governmental decision-making. Likewise, uncharged EIDL and mortgage-fraud references should not become independent engines for an upward variance. They are not counts of conviction, are not independently developed in the PSR, did not drive the guideline calculation, and are not quantified with the detail necessary to use them as aggravating sentencing grounds beyond the already serious PPP and UIC conduct.

Seriousness requires consequence. It does not require reflexive warehousing. The punishment that best fits this offense is punishment that locks down the financial risk, forces repayment, requires tax compliance, demands treatment, restricts liberty, and turns Ms. Bynum-Coleman's remaining capacity into measurable repair.

## IV. THE UNITED STATES' MOTION FOR AN UPWARD VARIANCE SHOULD BE DENIED

### A. The motion relies on aggravating facts already built into the range.

The Government's central premise is that the advisory range does not account for the 'frequency, fluency, and range' of Ms. Bynum-Coleman's deceptions. Gov't Mot. at 6. That premise is overstated. The PSR applied the sophisticated-means enhancement precisely because

the offense involved conduct more complex than a single false statement. PSR ¶ 38. It applied the disaster-relief enhancement because the conduct involved pandemic-relief fraud. PSR ¶ 39. It applied a 10-level loss enhancement because the relevant loss fell between $150,000 and $250,000. PSR ¶ 37. Those enhancements are the Guidelines' mechanism for translating scope, program vulnerability, false documentation, and financial harm into a sentence.

To be sure, the Court must consider the details of the offense under § 3553(a). But the Government seeks far more than consideration. It seeks a second punishment for the same features that increased the offense level by fourteen levels before acceptance and zero-point reductions. The Government characterizes the conduct as a 'blizzard' of paperwork, a 'mosaic' of accounts, and 'unmitigated greed.' Gov't Mot. at 6-8. Rhetoric does not identify a gap in the Guidelines. It simply repeats the aggravating narrative in stronger language.

The issue is not whether the offense was serious; it was. The issue is whether 41 months is necessary despite a record that also includes zero criminal history, acceptance of responsibility, voluntary repayment, caregiving responsibilities, documented trauma and treatment needs, and extraordinary community contributions. It is not.

**B. The deferred state disposition does not justify turning a first-offender federal case into a 41-month sentence.**

The Government's second pillar is that some relevant conduct occurred while Ms. Bynum-Coleman was under a court-ordered period of good behavior in a Henrico County matter. The PSR provides the full context: on November 5, 2020, Ms. Bynum-Coleman stipulated that facts were sufficient to find guilt, the court withheld a finding, she was required to complete 200 hours of community service, and the charges were dismissed on November 16, 2021; the matter appears to have been expunged. PSR ¶ 68. She has no adult criminal convictions. PSR ¶ 59. She

9

has zero criminal history points. PSR ¶ 60. She received the zero-point offender reduction. PSR ¶ 56.

The Court may consider the timing of the deferred disposition, but it should not convert a dismissed and expunged matter into the equivalent of criminal-history points, an aggravating-role adjustment, and an upward variance all at once. The count of conviction in this case - the May 2020 J.C. Bynum Construction application - preceded the November 2020 deferred disposition. Later relevant conduct did occur, and Ms. Bynum-Coleman accepts that the Court may consider it. But the PSR already did: it reviewed the full course of conduct and still concluded that she had no adult convictions, no criminal history points, no pending charges, no role adjustment, no obstruction, and a total offense level of 16 after acceptance and zero-point reductions.

The better lesson from the Henrico matter is not that a 41-month sentence is needed. It is that court supervision can demand service and compliance. Ms. Bynum-Coleman completed the community service required in that case and the charges were dismissed. Here, a carefully designed term of supervision with financial oversight, treatment, tax compliance, employment obligations, and community service can do what § 3553(a) requires without active incarceration.

**C. The Government overstates specific deterrence and ignores available controls.**

Specific deterrence focuses on preventing this defendant from committing future crimes. The realistic risk here is financial misconduct, not violence or danger to the physical safety of the community. The Court has tools to address that risk directly: no new credit without approval; full financial disclosure; monthly bank and business-account reporting; Probation access to financial information; tax compliance; application of windfalls to restitution; restrictions on applying for government benefits, grants, relief funds, or business financing without prior approval; and

outside accounting oversight. Those tools target the actual risk. A 41-month prison sentence does not.

The Government also cites marijuana positives while on pretrial release. The defense does not dismiss that concern. It supports drug testing and treatment conditions. It does not support an upward variance in a financial fraud case. The PSR reported nineteen urine screens, eleven negative and eight positive for marijuana, and no allegation that Ms. Bynum-Coleman committed a new fraud, threatened anyone, absconded, or obstructed justice while on release. PSR ¶ 106. Any substance-use concern is far better addressed by random testing, treatment, and mental-health care than by 41 months in federal prison.

The Court also has before it a concrete private-control structure not usually present in federal sentencings. Darryl K. Washington, the founder and CEO of DKW Communications, has known Ms. Bynum-Coleman for nearly twenty years and has already provided a bookkeeper and an accountant for her businesses. He has committed to ongoing mentorship and formal financial oversight, including monthly reviews of revenue, expenses, and compliance, and quarterly reviews of each business's financial position. That commitment is not character rhetoric; it is a supervision plan that can be incorporated into conditions requiring verified accounting, monthly reporting to Probation, and prior approval for new credit or government-relief applications.

### D. General deterrence does not require an outlier upward variance.

The Government invokes general deterrence as if every pandemic-benefits fraud case requires a substantial prison sentence. The Commission's data and the comparator cases do not support that proposition.

General deterrence is served by certain, public, meaningful consequences: a federal felony conviction, public judgment, restitution, financial restrictions, tax supervision, community

11

service, treatment, employment obligations, and a real threat of revocation if conditions are violated. A one-day or no-active-incarceration sentence under strict conditions is not a pass. It is a sentence that makes the punishment visible, enforceable, tailored, and restitution-oriented.

The Government's deterrence argument also ignores the actual sentencing landscape. In FY 2025 government-benefits-fraud cases, the United States Sentencing Commission reported that 43% of sentences were downward variances, the average downward-variance reduction was 64%, only 1% were upward variances, and approximately one-third of defendants did not receive prison. The Government's requested upward variance is statistically unusual; the defense request is within the range of individualized outcomes courts actually impose.

**Sentencing Data**

| Data source | Key data | Defense use |
| --- | --- | --- |
| USSC FY 2025 Government Benefits Fraud Quick Facts<br><br>https://www.ussc.gov/research/quick-facts | 965 cases; 72% CHC I; 56% received §4C1.1 zero-point adjustment; median loss $144,000; 26% losses greater than $550,000; sophisticated means in 13%; emergency/disaster enhancement in 22%; 43% downward variances; average downward-variance reduction 64%; only 1% upward variances; approximately 34% no prison. | Shows Government's 41-month upward variance is statistically unusual. Downward variances and non-prison sentences are part of the ordinary sentencing landscape. |
| USSC Interactive Data Analyzer FY25 Fourth Circuit §2B1.1 / CHC I filter | 11 cases in filter; 5 probation only; 3 probation plus alternatives; 2 prison only; 1 prison plus alternatives. | Shows probationary outcomes in majority of relevant Fourth Circuit/CHC I §2B1.1 sample. |

## V. A DOWNWARD VARIANCE IS WARRANTED UNDER § 3553(a)

The Government's filing asks the Court to see Ms. Bynum-Coleman almost entirely through the narrowest window of her life: the months in 2020 and 2021 when she made false statements, chased money she should not have taken, and spent funds that were not hers to spend. That window matters. It is why she is here. But it is not the whole house. The whole record shows a fifty-four-year-old Richmond woman who has lived nearly all her life in this community; a daughter who remains in daily contact with aging parents; a mother and stepmother whose household still shelters young adults finding their footing; a caregiver for relatives whose bodies and minds now depend on the steady help of others; a real estate agent

and developer whose skills are tied to her ability to repay; and a first-time federal defendant with no adult criminal convictions, no criminal-history points, no obstruction, and no aggravating role, whose timely acceptance of guilt, pre-sentencing repayment, and capacity for supervised work give this Court a sentence more useful than active incarceration.

There is a word the Government uses - greed - that is easy to write and hard to answer because it contains some truth. Ms. Bynum-Coleman did take money she was not entitled to receive. She did use public programs for private ends. She will not ask the Court to call those choices noble. But people are rarely only the worst name that can be attached to their worst decisions. The record also shows someone who has fed homeless people in tent cities, provided shelter through homes and apartment renovations, helped people leaving prison when they had nowhere else to go, supported schoolchildren and relatives, and tried to build housing in Petersburg for families who otherwise might not see ownership within reach. Those things do not cancel the offense. They show the Court is not sentencing an empty vessel. It is sentencing a person who still has work to do, people to serve, and the energy and heart for both.

There are concrete reasons to believe that work can be done. Ms. Bynum-Coleman pleaded guilty. She adopted the Statement of Facts. She received full credit for acceptance of responsibility. She has remained on bond for more than a year with no reported violations. She repaid $122,000 toward the PPP funds long before she was ever indicted, leaving a restitution problem that is still serious but far smaller than it once was. She has skills that can produce income, but only if she is allowed to use them. She has treatment needs that can be addressed in the community. And she has family responsibilities that incarceration will not simply inconvenience, but displace onto people who did not commit this offense.

13

Her personal history also matters, not as excuse but as context. The PSR describes childhood sexual abuse that lasted for years, a violent relationship in late adolescence, and a rape at age twenty that led to therapy and medication. It later documents diagnoses and recommendations for treatment relating to bipolar disorder, PTSD, ADHD, trauma, stress, and executive functioning. None of that made her commit fraud. But sentencing law asks the Court to consider the history and characteristics of the defendant because people do not arrive in federal court as statutes, guideline tables, or offense levels. They arrive as human beings shaped by injury, responsibility, fear, ambition, failure, and the capacity - sometimes after public humiliation and lawful punishment - to change direction.

That is what Ms. Bynum-Coleman asks for: not freedom from punishment, but a sentence that turns punishment toward repair. A prison sentence will warehouse her at public expense, stop her earning, slow restitution, interrupt treatment, cause additional trauma, and shift caregiving burdens to elderly and vulnerable family members. A sentence with no active incarceration will keep her under the authority of this Court and the supervision of Probation. It can impose strict reporting, restrict her finances, require tax compliance, require treatment, require employment reporting, and require that every available dollar move toward restitution. It can make the next years of her life smaller, stricter, humbler, and more useful.

The United States asks for forty-one months. That sentence would be more than punishment; it would be demolition. It would demolish the restitution plan before it can begin, demolish the family support structure the PSR describes, and demolish the remaining productive capacity that gives this Court leverage to require repayment and lawful work. Section 3553(a) does not require demolition where construction will do. It requires a sentence sufficient, but not greater than necessary.

14

**A. The nature of the offense supports punishment, but not active incarceration.**

This offense deserves punishment. Ms. Bynum-Coleman submitted false materials, obtained funds she should not have obtained, and failed to file her 2020 tax return. The Court can and should impose consequences that mark the seriousness of that conduct. But the purposes of punishment are not limited to prison. A felony conviction, restitution judgment, public sentencing, strict supervision, tax obligations, treatment conditions, community service, financial restrictions, employment obligations, and the threat of revocation are meaningful punishment.

The Government's description of the offense contains a true core and an exaggerated conclusion. The true core is that the conduct was fraudulent. The exaggerated conclusion is that only an above-Guidelines prison sentence can respond to it. The Sentencing Commission has already translated loss, sophistication, and pandemic-relief context into the advisory range. The Court may vary downward when the full person and full consequences demonstrate that active incarceration is greater than necessary. That is this case.

**B. Ms. Bynum-Coleman is a first felony offender with no adult convictions and a low-risk profile.**

Ms. Bynum-Coleman is 54 years old. She has no adult criminal convictions, no juvenile adjudications, no pending charges, and zero criminal history points. PSR ¶¶ 58-62. She qualifies for the zero-point offender reduction under U.S.S.G. § 4C1.1. PSR ¶ 56. The Commission created that adjustment because zero-point individuals, absent specified aggravating features, are meaningfully different from defendants with criminal histories. The Court should give that reality full weight, even though the two-level reduction has already been applied mechanically. She is also not a person whose life has been defined by idleness or antisocial conduct. She graduated from Virginia Commonwealth University in 2010 with a bachelor's degree in political

science and a minor in international relations. PSR ¶ 108. She has specialized training and skills in construction and real estate and holds a real estate license. PSR ¶ 110. Since 2003, she has worked as an associate broker with her mother's firm, VA Choice Real Estate, LLC, and the PSR records that she is the only active, income-producing agent in the company. PSR ¶ 111. Since 2008, she has operated J.C. Bynum Construction, with pending work contracts. PSR ¶ 112. Those facts matter for two reasons. First, they show that Ms. Bynum-Coleman has the capacity to earn lawful income and repay restitution if permitted to remain in the community. Second, they show that she can be supervised through work, accounting, financial disclosure, and tax compliance - the precise controls most likely to prevent recurrence.

Her pretrial performance confirms that community supervision can work. She has been on bond with pretrial supervision since March 21, 2025. PSR p. 1. Probation reports that she maintained a stable residence, maintained employment, and kept all scheduled office appointments. PSR ¶ 23. Although early screens returned positive for marijuana, Probation requested no action and reports no bond violations. PSR ¶¶ 23, 104-07. She has lived in the community during this prosecution without new criminal conduct and without reported violations. If strict community controls have worked before sentencing, there is every reason to believe they can work after sentencing, especially with the added weight of a felony judgment, restitution order, tax-compliance conditions, no-new-credit restrictions, financial disclosure, mental-health treatment, and any other court-ordered conditions.

### C. Her acceptance of responsibility and partial restitution are substantial.

Acceptance of responsibility is not merely a three-level guideline adjustment here. Ms. Bynum-Coleman admitted guilt, adopted the Statement of Facts, acknowledged the offense, and saved the Government and the Court the burden of trial. PSR ¶ 33; Plea Agreement ¶ 4. She

repaid approximately $122,000 before being told she was under investigation. PSR ¶¶ 29, 34. The remaining PPP restitution amount is $103,393. PSR ¶ 29. That remaining amount is significant, but it is also achievable only if the Court preserves her ability to work.

The PSR shows negative net worth, only $2,734.76 in liquid assets, no monthly income at the time of reporting, significant monthly obligations, and arrears. PSR ¶¶ 118-121. It concludes that she does not appear able to pay a fine, an additional fine sufficient to pay costs of imprisonment or supervision, or interest on any fine. PSR ¶ 121. Those findings support a restitution-first sentence. A long prison sentence would not increase the money available to victims. A supervised sentence that keeps her working and under financial controls will.

**D. The letters show a life capable of supervised repair, not mitigation by popularity.**

Courts often receive character letters saying a defendant is kind, generous, or loved. Ms. Bynum-Coleman's letters do more. They identify specific work, specific people, specific institutions, and specific ways in which she has responded to harm, housing instability, poverty, youth needs, mental health, and civic problems. They come from family members, business professionals, nonprofit partners, educators, elected officials, housing beneficiaries, and community advocates. They do not ask the Court to ignore the offense. They ask the Court to sentence the whole person.

The character letters submitted with these sentencing materials support the PSR's summary with proof. They do not offer generic praise. They describe consistent, specific, first-hand experiences of Ms. Bynum-Coleman's conduct that make the requested sentence practical rather than sentimental: housing people who had nowhere to go; building affordable homes; helping families avoid eviction; mentoring small-business owners; supporting youth; caring for

17

disabled and elderly family members; and creating community structures that can continue under supervision.

Several elected officials who have worked with Ms. Bynum-Coleman describe a civic record that predates this case by years and is directly relevant to the sentence requested here. Senator Jennifer Carroll Foy writes that Ms. Bynum-Coleman remained a constant and effective presence in the General Assembly, worked on legislation, supported candidates, fed people living in tent cities, fought for mental-health services as part of housing stability, and used her own resources to build affordable housing in Petersburg after decades of disinvestment. Delegate Joshua Cole likewise describes Ms. Bynum-Coleman as an effective advocate for teacher pay, labor rights, voter protection, women's rights, and affordable housing. Chesterfield County Supervisor LeQuan Hylton strengthens this same civic-service record. He has known Ms. Bynum-Coleman and her family for more than fifteen years. His first interaction with her was not political or transactional: she and Mr. Coleman stopped to help him when items shifted in his truck, loaded the items onto their trailer, and took them to the dump. Over the years, he watched her run for office, advocate for legislation, support candidates, and quietly resolve community problems, including a large street hole that neighbors had unsuccessfully tried to address. He also describes her affordable-housing work in Petersburg as the kind of work he has encouraged her to bring to Chesterfield County because of the need for affordable housing there. Senator Michael Jones provides one of the most important letters for sentencing because it speaks directly to accountability. When residents complained about noise and abandoned vehicles at a re-entry and recovery house Ms. Bynum-Coleman operated in his district, she did not deny or deflect. She moved the resident creating the issue, imposed a 10:00 p.m. curfew, hired a new house manager, went door-to-door apologizing to neighbors, and no further

18

complaints followed. That example matters because it shows the Court the very thing the Government says is missing: the ability to listen when harm is identified, accept responsibility for a problem within her control, correct it, and comply with structure.

Dr. Deirdre M. Condit, a retired tenured VCU political science professor, former department chair, and former associate dean, supplies additional life-history context. She knew Ms. Bynum-Coleman first as an undergraduate at VCU - a dedicated, struggling single mother trying to work her way through a college degree - and confirms that Ms. Bynum-Coleman graduated in 2010 with a Bachelor of Arts in Political Science. Dr. Condit later invited her to speak to an upper-division Women and American Politics class about running for public office as a Black woman. Most importantly for present purposes, Dr. Condit describes Ms. Bynum-Coleman's long-standing interest in housing for unhoused women and recounts connecting a homeless working woman, Ebonee Hill, to Ms. Bynum-Coleman, who then provided a room at no cost. That account corroborates the broader record: Ms. Bynum-Coleman's housing work was not manufactured for sentencing; it existed long before sentencing became real.

The housing letters are even more concrete. Angel Miles explains that Ms. Bynum-Coleman is building her a four-bedroom, 1,600-plus-square-foot affordable home designed for a working single mother and her three children, with separate bedrooms for children who have never had their own rooms, a dedicated home office because Ms. Miles works remotely, and built-in equity because Ms. Bynum-Coleman covered the down payment and closing costs. Robin Christopher Plummer describes a working partnership between his barbershop and Ms. Bynum-Coleman's housing program: jobs through his businesses, housing through her program, emergency hotel rooms when needed, free barber training for people coming out of reentry, and a current one-bedroom apartment being held for a homeless working father with a young

19

daughter. These are not abstract claims of good character. They are real homes, real people, and real projects that disappear or stall if the Court removes Ms. Bynum-Coleman from the community.

Support letters from Chanelle Welch and Darryl K. Washington supply something the Court should want to see before imposing a no-active-incarceration sentence: real structure. Ms. Welch, a Bank of America manager and Ms. Bynum-Coleman's business partner, explains that she encouraged the creation of Greater Community Housing, brought in a bookkeeper and accountant, and is using her banking and management experience to provide the financial controls, organization, compliance, and operational accountability that complement Ms. Bynum-Coleman's community relationships and housing vision. She also confirms that Greater Community Housing is pursuing a Petersburg affordable-housing development scheduled for local planning consideration, with units reserved in part for veterans, people with disabilities, and low-income residents. Mr. Washington has known Ms. Bynum-Coleman as a friend and professional colleague for nearly twenty years. He describes hiring her in business-development and community-engagement roles, working with her on Petersburg community initiatives, and supporting her housing work through donations of clothing, food, computers, and mentorship for entrepreneurs. He also describes a current business opportunity that can create lawful income and jobs. Most important for sentencing, he has already provided Ms. Bynum-Coleman with a bookkeeper and an accountant and commits to direct, ongoing mentorship, monthly reviews of revenue, expenses, and compliance, and quarterly reviews of each business's financial position. That evidence strengthens the defense proposal because it shows a concrete way for supervision to work: Ms. Bynum-Coleman can remain in the community, subject to Probation's financial restrictions, while her work is also supported by outside accounting, bookkeeping, and

20

professional oversight. That commitment does not replace Probation. It makes Probation's work more realistic. A federal sentence can require Ms. Bynum-Coleman to disclose all business records, submit to credit and business restrictions, provide tax filings, and report business income. Mr. Washington's promised oversight, if accepted by Probation and the Court, adds a private accountability layer from a person who has built a major business and has the experience and resources to follow through.

Jason Richardson, Ms. Bynum-Coleman's personal and business insurance agent for more than twenty years, offers another candid professional perspective that is especially useful for sentencing. He acknowledges that Ms. Bynum-Coleman's administrative systems have not always matched her vision and drive, but he also explains that when she expanded into transitional housing, she obtained and maintained the specialized insurance coverage necessary to operate responsibly. He confirms that the housing program was real, the people housed were real, and the purpose was real. His letter supports the defense request for a sentence built around structure: insurance, bookkeeping, accounting oversight, financial reporting, and Probation supervision - not active incarceration. Kelvin Oliver likewise describes more than two decades of professional real-estate work, client referrals, housing-program property acquisition, and assistance to homeowners at risk of foreclosure.

Other letters show practical service to others in smaller but equally telling ways. Jantina Washington, a frontline phlebotomist during the pandemic, describes how Ms. Bynum-Coleman helped her navigate rent-relief assistance when she was at risk of losing housing after contracting COVID-19 multiple times while working in public-facing health care. Ashley Joy Taylor, a small business owner, publisher, and executive assistant, describes another version of the same conduct: during the pandemic, when her business was struggling and she was at risk of eviction,

21

Ms. Bynum-Coleman connected her to rent-abatement and emergency-assistance resources that resulted in eight months of rent being paid and allowed her to stabilize, rebuild, and continue operating what became Ashley Taylor Studios. Those examples are not abstractions about kindness. They show a practical skill set - identifying resources, connecting vulnerable people to help, and preventing housing instability - that can be converted into court-ordered community service.

Keisha Cummings adds a decade-long account of work that is directly relevant to a community-based sentence. She describes working with Ms. Bynum-Coleman on Richmond Public Schools initiatives, including the opening of Patrick Henry Elementary, recycling work, free homeownership education classes in housing projects, and a peer-to-peer mediation program designed to reduce suspensions and school violence. She also describes Ms. Bynum-Coleman bringing food into Richmond tent communities, supporting reading programs for children in housing projects, accepting mental-health crisis housing referrals when formal systems moved too slowly, and paying rent for a woman facing eviction during the pandemic. Yolanda and Mario Haskett describe homeless outreach, hygiene bags, clothing distribution, school-supply drives, mentoring, tutoring, youth support, and recognition efforts for young athletes. This testimony provides specific service categories that Probation can approve and monitor without permitting Ms. Bynum-Coleman to handle money, public funds, grants, or loan applications.

Jon-Christopher Bolling supplies a different kind of proof: not just that Ms. Bynum-Coleman cares about people, but that she has repeatedly absorbed personal cost to help them. He describes Ms. Bynum-Coleman helping him and his wife find a home, discovering an HVAC defect before closing, and paying the full replacement cost herself even though the expense exceeded her commission on the sale. He also describes her affordable-housing advocacy, her

willingness to run for office without institutional support because she believed housing, teacher

pay, and access to health care mattered, and her later work turning those stated values into actual

affordable housing for families who needed it.

Dr. Darice Davis, Ms. Bynum-Coleman's niece and a licensed clinical psychologist,

supplies lifetime family context. She describes an aunt who was compassionate, generous, and

kind long before sentencing was a possibility. She recalls Ms. Bynum-Coleman inviting a

college student who could not travel home to join the family for Thanksgiving, visiting school

lunches and making young people feel seen, and helping family members with housing by

renting properties or opening her own home when people were in need. Her letter reinforces that

the conduct described by community witnesses was not newly manufactured mitigation. It is part

of a long-standing pattern of responding when people needed a place, a meal, or a person willing

to act.

Additional family letters also make the PSR's family-reliance findings immediate and

concrete. Carol Bynum, Ms. Bynum-Coleman's mother and a licensed real estate broker,

explains that Ms. Bynum-Coleman is her associate broker and most active agent; her

commissions and construction work help keep the family real-estate business functioning; and

the case's publicity has already damaged, but not destroyed, that income stream. Carol also

describes the care needs of two disabled sisters: one intellectually disabled sister living with her,

and Jacqueline, who is paralyzed on one side after a stroke and needs supplies, food, adaptive

furniture, and physical assistance with bathing. Jerome Bynum, Ms. Bynum-Coleman's father, is

a Vietnam veteran and retired Richmond police officer recovering from prostate cancer, walking

with a walker, and relying on Ms. Bynum-Coleman and Rashad for medical appointments,

transportation, and emergency assistance. Litisha Lockett corroborates the physical care provided

23

to Aunt Jackie Hill since her stroke, including bathing, lifting, supplies, and daily dignity. John 'Tommy' Lockett adds that Ms. Bynum-Coleman became the stable caregiver for his daughter Lacey when both he and Lacey's mother were arrested in 2012; what began as weekend babysitting became nearly six months of care, followed by years of financial support, school advocacy, childcare, transportation to activities, and daily stability for Lacey and, later, another younger child as well. He further explains that he lacks the financial means to replace that support, has an intellectually disabled adult son of his own, and cannot provide the physical lifting and assistance Aunt Jackie requires. Clifton Smith, the father of Ms. Bynum-Coleman's youngest son Cody, likewise explains that Cody is autistic, twenty-four years old, and dependent on Ms. Bynum-Coleman for consistent care and support that he cannot provide; he also describes how she has kept him working through property jobs and involved him in her re-entry and sober-living efforts. Together, these letters show that Ms. Bynum-Coleman is not merely loved by her family; she performs essential caregiving, financial, employment, transportation, and medical-support functions for children, elderly parents, disabled relatives, recovering addicts, and an autistic adult son. These letters do not ask the Court to excuse the offense. They explain why incarceration would produce immediate collateral harm to elderly and disabled people, dependent children, and vulnerable family members who are not before the Court.

This is not mitigation by popularity. It is mitigation by demonstrated conduct. The same § 3553(a) that requires the Court to consider the nature of the offense requires the Court to consider the history and characteristics of the defendant. Ms. Bynum-Coleman's history includes serious wrongdoing, but it also includes years of service that the Government's memorandum does not grapple with. A no-active-incarceration sentence would preserve the community value the letters describe while imposing court-enforced accountability.

24

**E. Family caregiving consequences are concrete and severe.**

The family consequences here are not generalized hardship. They are specific, daily, and corroborated. The PSR records that Ms. Bynum-Coleman helps care for her father, a retired police officer and prostate-cancer survivor who suffers from lasting effects of radiation treatment; provides ongoing care for Aunt Jackie, who has been wheelchair-bound since a stroke during COVID; and supports her mother in caring for her mother's sister, who has an intellectual disability and requires daily assistance. PSR ¶¶ 72, 91-92.

The defense recognizes that family hardship alone does not control sentencing. But § 3553(a)(1) requires the Court to consider the defendant's history and characteristics, and § 3553(a)(2)(D) requires consideration of needs that can be met in the most effective manner. Removing the person who provides daily practical care to disabled and elderly relatives would impose punishment far beyond Ms. Bynum-Coleman herself, including on vulnerable people who had no part in this offense. A sentence of strict supervision, financial controls, employment obligations, tax compliance, treatment, community service, and revocation risk can punish her while preserving essential caregiving.

**F. Mental-health treatment and supervision are better than imprisonment for rehabilitation.**

Treatment considerations point in the same direction. The PSR records significant trauma and diagnoses. Ms. Bynum-Coleman reported sexual abuse from ages 11 to 16, physical abuse by a boyfriend from ages 17 to 20, and rape at age 20. PSR ¶¶ 78-80. Mental-health records identify Bipolar I Disorder, PTSD, ADHD, and chronic PTSD with dissociation, with recommendations for therapy, psychiatric evaluation, psychoeducation, coping strategies, family

25

support, and abstinence from illicit substances. PSR ¶¶ 98-103. Treatment goals therefore support supervised treatment in the community, not a longer prison term.

Ms. Bynum-Coleman does not offer those facts as an excuse. She offers them as the basis for a treatment condition that can reduce risk and improve compliance. The Court can order mental-health treatment; require releases allowing Probation to communicate with providers; require random testing and substance-abuse treatment if indicated; and require family or executive-functioning work as recommended. Those conditions respond to the PSR's clinical information. A 41-month prison term does not.

Section 3553(a)(2)(D) directs the Court to consider the need to provide medical care or other correctional treatment in the most effective manner. For this defendant, with these diagnoses, the most effective manner is structured outpatient treatment verified by Probation, not incarceration that interrupts continuity of care and removes the stabilizing supports the PSR and letters identify.

Carol Bynum's letter adds the human detail: she has watched the stress of this case, the media coverage, and public exposure wound her daughter "in ways that are not visible from the outside," and she fears not only what incarceration would do to the family, but what it would do to Ms. Bynum-Coleman mentally.

That fear is grounded in more than a mother's worry. The Bureau of Justice Statistics has reported that prisoners and jail inmates experience serious psychological distress at rates far exceeding the general population. Bureau of Justice Statistics, Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-12, at 1-4. Deconstructing Stigma, citing Bureau of Justice Statistics data, reports that 63% of incarcerated people with mental-health

26

challenges are not receiving treatment while in prison or jail

(https://deconstructingstigma.org/guides/incarcerated-mh).

Those broader facts matter because the PSR already identifies the very vulnerabilities that make treatment important here. A person who enters incarceration with manageable mental-health symptoms may experience worsening symptoms because of environmental stressors, disrupted treatment relationships, inconsistent medication access, isolation from family support, and difficulty reentering care after release. For Ms. Bynum-Coleman, whose PSR identifies the need for therapy and psychiatric evaluation, incarceration would not be the most effective treatment setting. It would increase the risk of interruption and destabilization precisely when the Court can order structured outpatient treatment, verification, and compliance in the community.

**G. The Court can impose rigorous conditions that directly address the offense.**

A central reason a non-prison sentence is sufficient here is that the Court can make it demanding. The PSR itself recommends special conditions requiring application of tax refunds and other financial gains to court-ordered obligations, no new credit without approval, access to financial information, substance-abuse treatment if positive tests or alcohol abuse occur, mental-health treatment, IRS restitution as a condition of supervision, and timely, truthful federal and state tax returns for Ms. Bynum-Coleman and any businesses she operates. PSR ¶ 124. The defense accepts those conditions and proposes additional ones tailored to the offense.

The Court can require Ms. Bynum-Coleman to provide monthly personal and business bank statements to Probation; disclose all business entities, accounts, payment processors, and digital wallets; obtain approval before opening any new business account, line of credit, or loan application; refrain from applying for federal, state, or local grant, relief, loan, or benefits funds for herself or any business without prior Probation approval; maintain a bookkeeper and

27

accountant; provide quarterly financial reports prepared by that accountant; authorize Probation to communicate with the accountant and Darryl Washington or any other approved business mentor; and apply tax refunds, settlements, inheritances, lottery winnings, and other windfalls to restitution. These conditions are more precise than prison. They are also enforceable.

The Court can also require community service; continued employment; tax filing and proof of filing; mental-health treatment; substance testing and treatment if needed; full financial disclosure; monitored business accounts; prior approval before new debt, credit, loans, grants, or benefit applications; and a prohibition on fiduciary control over campaign, nonprofit, charitable, or third-party funds absent Probation approval. If Ms. Bynum-Coleman violates these conditions, she faces revocation and imprisonment. That is a real consequence and a real deterrent.

## VI. THE COMPARATOR RECORD DIRECTLY REFUTES THE GOVERNMENT'S 41-MONTH THEORY

The Government's theory is that this offense category, these aggravators, and general deterrence require prison - and not merely prison, but 41 months. The comparator record defeats that premise. Courts have imposed non-incarceration sentences in cases involving more money, more serious charge structures, money laundering, false claims, EIDL/PPP combinations, false tax documents, government prison requests, and extensive personal-use allegations.

| Case | Relevant conduct / government or guideline position | Sentence imposed |
|---|---|---|
| United States v. Janet Jenison, S.D. Ohio, No. 2:21-cr-90 | Three fraudulent PPP applications with fabricated bank statements and tax forms; Total Offense Level 16, Criminal History Category I, Guidelines 21-27 months; Government requested 21 months imprisonment, a $95,000 fine, supervised release, restitution, and forfeiture. | Five years probation; no active incarceration; $250,000 fine; restitution $128,783.04; forfeiture of $160,247. |
| United States v. Melissa T. Stevenson, E.D. Mo., No. 4:23-cr-300 | PPP bank fraud; Total Offense Level 16, Criminal History Category I; Guidelines 21-27 months; restitution $279,201.03. | Five years probation; no active incarceration; 100 hours community service; financial controls and restitution. |

28

| | | |
|---|---|---|
| United States v. Mehdi Pazouki, E.D. Va., No. 1:24-cr-29 | $455,166.33 PPP/EIDL fraud; Government requested 12 months and one day, restitution, and forfeiture. | Three years probation; restitution $455,166.33; no active incarceration. |
| United States v. Karen Gaston, D. Conn., No. 3:25-cr-108 | Wire fraud and illegal monetary transactions; over $1.1 million PPP/EIDL fraud; Government sought a Guidelines prison sentence in the 37-46 month range. | Three years probation; four weekends of intermittent confinement; treatment; financial controls; restitution $1,163,910. |
| United States v. Monica Cannon-Grant, D. Mass., No. 1:22-cr-10057 | Public-facing nonprofit and tax-related fraud case; Total Offense Level 15, Criminal History Category I; Guidelines 18-24 months; Government requested 18 months imprisonment. | Four years probation; no active incarceration; 100 hours community service; restitution and forfeiture-related obligations. |
| United States v. Dent Hunter, E.D. La., No. 2:23-cr-59 | False statements and money laundering; pandemic-relief fraud involving approximately $1 million in SBA restitution. | Five years probation; 400 hours community service; restitution $1,007,273.97. |
| United States v. Clifton C. James, E.D. La., No. 24-179 | False statements, theft of government funds, money laundering, and false claim counts; restitution totaling $785,618.65. | Five years probation; 50 hours community service; monthly restitution payments. |
| United States v. Mark William Bailey, S.D.W. Va., No. 5:23-cr-131 | $451,237.51 theft of government monies; advisory range 12-18 months; zero-point offender. | Five years probation; restitution $451,237.51; no active incarceration. |
| United States v. Lorenzo Gordon, E.D. Mo., No. 4:24-cr-22 | Five false PPP/EIDL applications; over $272,000 fraudulently collected; Guidelines 18-24 months; Government requested 18 months; restitution $308,354.88. | Five years probation; 200 hours community service. |
| United States v. Racquel Pichon, E.D. La., No. 23-cr-189 | False statements and theft of government funds; restitution $354,642.50. | Five years probation; no active incarceration; financial controls; restitution $354,642.50. |

Dent Hunter is one of the clearest examples. Hunter pleaded guilty to false statements to the SBA and money laundering. His factual basis involved multiple entities, six PPP applications, five EIDL loans, false documents and representations, and restitution of more than $1 million. The judgment imposed five years of probation, 400 hours of community service, financial disclosure, no-new-credit restrictions, business financial audits, and a restitution schedule - no prison. Clifton James pleaded guilty to false statements, theft of government funds, money laundering, and filing a false claim, with restitution of $785,618.65. The judgment imposed five years of probation, business audits, no new debt or credit, mental-health treatment,

community service, and restitution - no prison. Those two judgments alone answer the Government's claim that Sheila's aggravators require 41 months.

Racquel Pichon is also highly instructive. Pichon pleaded guilty to false statements and theft of government funds, with $354,642.50 in restitution. The judgment imposed five years of probation, twelve months of home detention, employment logs, vocational training, cognitive behavioral treatment, financial disclosure, and business-finance audits - no active prison. Lorenzo Gordon involved five PPP/EIDL funding applications, an 18-to-24-month range, a government request for 18 months, and restitution exposure over $300,000. The court imposed probation and community service. Mark Bailey involved a 12-to-18-month range and $451,237.50 in restitution; the court imposed probation and one year of home detention. Monica Cannon-Grant involved a government request for 18 months on an 18-to-24-month range in a public-benefit fraud/tax case; the court imposed probation, home detention, restitution, and no fine.

These are not arguments from sympathy. They are data points from actual sentencing outcomes. They show that a no-active-incarceration sentence is serious, common enough to be a legitimate sentencing option, and especially appropriate where the defendant is a zero-point first offender, restitution can be prioritized, financial restrictions target the risk, and prison would reduce rather than increase public benefit.

## VII. THE COURT SHOULD IMPOSE CONDITIONS THAT MAKE ACCOUNTABILITY MEASURABLE

The defense respectfully requests that the Court deny the Government's motion, vary downward, and impose one of the following structures.

**A. Primary request: no active incarceration.**

On Count Two, impose no term of imprisonment. Impose the mandatory $100 special assessment, restitution in the amount determined by the Court, and no Guidelines fine because the PSR establishes inability to pay and restitution should take priority. If the Court concludes that a fine is necessary to structure a non-imprisonment sentence on Count Two because probation is barred, the defense requests only a nominal fine that does not impair restitution.

On Count Twelve, impose a probationary sentence with the mandatory $25 special assessment and conditions including community service, tax compliance, treatment, employment obligations, financial disclosure, and the financial controls set forth below. Count Twelve is a Class A misdemeanor, and the probationary conditions would provide the enforcement vehicle if the Court imposes no imprisonment on Count Two.

**B. Alternative request: one day of imprisonment followed by supervised release.**

If the Court concludes that a custodial sentence is required or that supervised release provides the cleaner legal structure, the defense requests a sentence of one day of imprisonment on Count Two, and if necessary one day concurrent on Count Twelve, followed by five years of supervised release on Count Two and one year of supervised release on Count Twelve, concurrent. The supervised release should include the strict financial, tax, treatment, employment, restitution, and community-service conditions below.

This alternative gives the Court a custodial component and the full enforcement mechanism of supervised release, while avoiding the unnecessary harm of active incarceration. It is also the sentence that best preserves restitution, public safety, treatment, family caregiving, and the community benefits the letters describe.

**C. Proposed special conditions.**

31

1. Maintenance of lawful employment, self-employment, or other productive work approved by Probation, with prompt reporting of all sources of income, business accounts, client funds, contractors, major transactions, and business obligations as directed by Probation.

2. A substantial term of community service, up to 400 hours, structured so it does not interfere with employment, restitution payments, or caregiving obligations, and preferably directed toward homelessness, re-entry, youth mentoring, housing stability, or financial-literacy service approved by Probation.

3. Mental-health evaluation and treatment as directed by Probation, including authorization for Probation to communicate with treatment providers; psychiatric evaluation if recommended; and compliance with recommended therapy addressing PTSD, ADHD, stress management, and executive functioning.

4. Random drug testing and substance-abuse treatment if directed by Probation, including abstinence from marijuana and all controlled substances not lawfully prescribed.

5. Full financial disclosure to Probation, including monthly personal and business bank statements, credit-card statements, payment-processor records, digital-wallet records, business ledgers, and any other requested financial information.

6. No new credit charges, loans, lines of credit, business accounts, business entities, grant applications, benefit applications, or federal/state/local relief-fund applications without prior written approval from Probation.

7. No fiduciary control over campaign, nonprofit, charitable, or third-party funds without prior approval from Probation and verified accounting controls.

8. Maintenance of a bookkeeper and accountant for any business Ms. Bynum-Coleman operates; quarterly financial reports to Probation; and authorization for Probation to

32

communicate with the accountant, bookkeeper, and any approved business mentor or monitor, including Darryl K. Washington if the Court approves that arrangement.

9. Timely, truthful, and complete federal and state tax returns for Ms. Bynum-Coleman and any business she operates, with proof of filing to Probation and IRS restitution compliance as directed.

10. Application of tax refunds, lottery winnings, inheritances, judgments, settlements, and other windfalls to court-ordered financial obligations, as recommended by Probation and ordered by the Court.

11. A restitution payment schedule based on ability to pay, subject to adjustment as income increases, with priority over any fine.

12. No fine, or only a nominal fine if necessary to structure a non-imprisonment sentence, because the PSR finds negative net worth, limited liquidity, arrears, and inability to pay a fine or interest without impairing restitution.

## VIII. WHY THIS SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY

The proposed sentence reflects the seriousness of the offense. A felony conviction, restitution judgment, tax obligations, public sentencing, strict supervision, financial controls, community service, treatment, employment obligations, and the threat of revocation are serious consequences. They also tell the public that pandemic-benefits fraud results in federal conviction, public accountability, court supervision, restricted financial liberty, and repayment. That promotes respect for law without inflicting needless collateral damage.

The proposed sentence provides just punishment. Ms. Bynum-Coleman would not be free to resume life as before. Her freedom would be supervised. Her finances would be monitored.

33

Her ability to borrow, open accounts, handle third-party funds, apply for government relief, or operate businesses without oversight would be constrained. She would have to work, report, file taxes, attend treatment, pay restitution, and perform service. A violation could result in imprisonment. That is punishment tailored to the crime.

The proposed sentence affords adequate deterrence. Specific deterrence is achieved through financial monitoring, tax supervision, treatment, employment obligations, and revocation risk. General deterrence is achieved through the certainty and visibility of conviction and meaningful court control. The Government's position assumes that deterrence rises in a straight line with months in prison. Section 3553(a) requires a more exacting inquiry. For a first felony offender with a financial-risk profile, a public felony conviction and strict financial supervision can deter as effectively as prison while preserving restitution and community stability.

The proposed sentence protects the public. The public risk is financial; the conditions directly restrict financial risk. Ms. Bynum-Coleman would have no unsupervised path to repeat the offense conduct: no new credit or loan applications without approval, no government-relief applications without approval, no unmanaged business accounts, no undisclosed finances, and no control over third-party funds without safeguards. Active incarceration protects the public only by removing her temporarily. Supervision protects the public by restructuring the conditions under which she lives and works.

The proposed sentence provides treatment in the most effective manner. The PSR's mental-health information supports treatment, therapy, psychiatric evaluation if recommended, and testing. Those services are better delivered through a supervised community plan than through a prison term imposed for the purpose of treatment.

34

The proposed sentence promotes restitution. Ms. Bynum-Coleman has already repaid a substantial portion of the PPP proceeds. The remaining restitution will be paid through work, business income, and monitored financial accountability. Incarceration would likely eliminate or diminish the income sources needed for repayment and destabilize the family and business network that supports lawful earning.

The proposed sentence avoids unwarranted disparity. It aligns with Commission data showing frequent downward variances in government-benefits fraud, with Fourth Circuit data showing heavy use of probation or alternatives in Section 2B1.1 Criminal History Category I cases, and with comparator cases in which courts imposed probation, intermittent confinement, community service, financial controls, fines, restitution, or other alternatives for pandemic-benefits fraud involving similar or greater losses. The Government's 41-month sentence is the sentence most likely to create disparity.

That kind of punishment promotes respect for the law because it is visible, enforceable, and tied to repair. It tells the public that pandemic-relief fraud has consequences. It also tells the public that sentencing is not reflexive warehousing. It is the careful use of judicial power to impose the sanction that best serves the statutory purposes.

## CONCLUSION

Section 3553(a) permits the imposition of a just sentence: one that punishes, deters, protects the public, promotes restitution, and converts Ms. Bynum-Coleman's remaining capacity into measurable repair. The letters before the Court show a consistent pattern: when people needed housing, advocacy, crisis help, support, employment, or a stable caregiver, Ms. Bynum-Coleman acted. A sentence with no active incarceration would require her to keep acting - under court supervision, with financial controls, treatment, restitution, and enforceable conditions.

35

Ms. Bynum-Coleman made serious and deliberate decisions that brought her before this Court. She has accepted that. She stands convicted of a federal felony and a federal misdemeanor. She has repaid a substantial amount of money. She will live with the public consequences of this conviction for the rest of her life. The question is not whether she should be punished. She should be. The question is whether active incarceration adds anything necessary to a sentence that can include felony conviction, restitution, financial monitoring, treatment, tax compliance, employment obligations, community service, and revocation risk. It does not. On this record, active incarceration would be greater than necessary and less likely to produce restitution, rehabilitation, and community stability.

For these reasons, and any others that may appear to the Court or that may develop at the sentencing hearing, Ms. Bynum-Coleman respectfully asks the Court to deny the United States' Motion for Upward Variance, grant her Motion for a Downward Variance, and impose a sentence with no active incarceration. In the alternative, she asks the Court to impose one day of imprisonment followed by supervised release with strict financial, tax, treatment, restitution, and community-service conditions.

**SENTENCING EVIDENCE AND WITNESS NOTICE**

Pursuant to the Court's Sentencing Guideline Order, Ms. Bynum-Coleman provides notice that the defense expects to present mitigation primarily through written materials. The defense relies on the PSR, plea materials, repayment record, comparator materials, proposed conditions, and character letters submitted separately or with the sentencing materials, including letters from family members, community members, housing beneficiaries, business partners, public officials, educators, and professionals who have observed Ms. Bynum-Coleman's work and character and whose statements address, among other things, Ms. Bynum-Coleman's family

36

role, caregiving responsibilities, community work, housing work, character, work history, remorse, and ability to contribute productively if permitted to remain in the community.

The defense does not seek to burden the Court with cumulative testimony. Written statements should be sufficient for most mitigation issues unless the Court requests otherwise or the United States places a particular factual mitigation issue in dispute. If the Court believes live testimony would materially assist the sentencing decision, or if the United States contests material mitigation facts in a way that creates good cause for testimony, the defense respectfully requests leave to present limited lay testimony addressing family-care responsibilities, community/housing impact, restitution capacity, and character.

Respectfully submitted,

**SHEILA BYNUM-COLEMAN**

By Counsel:

_/s/ S. Sadiq Gill_

S. Sadiq Gill (VSB No. 30835)
DURRETTE, ARKEMA, GERSON & GILL, PC
1111 E. Main Street, 16th Fl.
Richmond, VA 23219
Telephone: (804) 775-6900
Email: sgill@dagglaw.com
*Counsel for Sheila Bynum-Coleman*

## CERTIFICATE OF SERVICE

I certify that on this 25th day of June, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

_/s/ S. Sadiq Gill_
S. Sadiq Gill (VSB No. 30835)
*Counsel for Sheila Bynum-Coleman*

37